BOTLOR (MAURO v.). See Case No. 9,311.
BOTT (U. S. v.). See Case No. 14,626.

---

### BOTTLES OF.

[Note. Cases cited under this title will be found arranged in alphabetical order under the quantity or number of bottles; e. g. "Bottles of Liquors. See Ten Thousand Bottles of Liquors."]

---

## Case No. 1,688.

### BOTTOMLEY v. UNITED STATES.

[1 Story, 135.] [1]

Circuit Court, D. Massachusetts. May Term, 1840. [2]

EVIDENCE — PRIOR FRAUDULENT TRANSACTIONS— INTENT — KNOWLEDGE — COLLATERAL FACTS — PUBLIC OFFICER—PRESUMPTION OF INNOCENCE— CUSTOMS DUTIES — PERMIT TO LAND GOODS — FORFEITURE—PLEADING — PAROL EVIDENCE TO ESTABLISH FRAUD — VOID AND VOIDABLE CONTRACTS—PLEADING FRAUD—INSTRUCTIONS.

1. Where a party is charged with fraud in a particular transaction, evidence may be offered of similar previous fraudulent transactions between him and third persons. And whenever the intent or guilty knowledge of a party is material to the issue of the case, collateral facts, tending to establish such intent or knowledge, are proper evidence.

[Cited in U. S. v. 146.650 Clapboards, Case No. 15,935; New York Mut. Life Ins. Co. v. Armstrong, 117 U. S. 599, 6 Sup. Ct. 887.]

[See Alfonso v. U. S., Case No. 188; Castle v. Bullard, 23 How. (64 U. S.) 172; U. S. v. Four Cases of Merinoes, Case No. 15,-146; Butler v. Watkins, 13 Wall. (80 U. S.) 456; U. S. v. Quantity of Tobacco, Case No. 16,106; Smith v. Schwed, 9 Fed. 483.]

2. When a public officer is charged with conspiracy or fraud in the discharge of his duties, the presumption of law in favor of his innocence will prevail against circumstances of suspicion; but it may be overcome by proof of previous delinquencies of a similar nature.

3. Where a permit to unlade and deliver goods was obtained by a fraudulent collusion between the claimant and the deputy collector of the port of New York, it was held, that such a permit was utterly void; and that the goods landed under it were forfeited.

[Cited in Day v. New England Car Spring Co., Case No. 3,688; The Sarah B. Harris, Id. 12,344.]

4. The forfeiture may be enforced upon a general count under the 50th section of the collection act of 1799, c. 128 [Story's Laws,

---

[1] [Reported by William W. Story, Esq.]
[2] [Affirming an unreported decision of the district court.]

617; 1 Stat. 665, c. 22], charging that the goods were landed without a permit; for a void permit is no permit.

[Cited in The Sarah B. Harris, Case No. 12,-344.]

[See Ogden v. Maxwell, Case No. 10,458.]

5. Parol evidence is admissible in all cases to establish fraud.

6. Whenever a contract or obligation, under seal, is void ab initio, the general plea of non est factum is proper. Where it is merely voidable, a special plea, setting forth the special circumstances is necessary.

[7. It is not reversible error to refuse to give abstract or irrelevant instructions, or those too vague or general to entitle the claimant to have them answered.]

[8. Quoted in Garland v. Davis, 4 How. (45 U. S.) 152, to the effect that the days for such subtleties as technical niceties in legal procedure are in a great measure passed away.]

[Error from the district court of the United States for the district of Massachusetts.]

This is a writ of error to a judgment of condemnation in rem by the district court upon an information of seizure of two cases and one hundred and fourteen pieces of broadcloth seized on land at Boston, as forfeited to the United States, and claimed by James Bottomley, Jr., as owner. The cause was tried by a jury, and a verdict found for the United States, upon the issue on the first count in the information, and upon this verdict the judgment of forfeiture was pronounced by the district judge. A bill of exceptions was filed at the trial, and upon that bill of exceptions the present writ of error was brought by the claimant to reverse the judgment. [Judgment affirmed.]

The information, or, as it is often called, libel of seizure, contained two counts. The first count was founded on the fiftieth section of the revenue collection act of 1799, c. 128 [Story's Laws, 617; 1 Stat. 665, c. 22], and in substance alleged, that the goods were imported from a foreign port or place, to the district attorney unknown, into the port of New York, and were unladen and delivered from the vessel or vessels, in which they had been imported, at the port of New York, without any license or permit whatever, from the collector, naval officer, or other competent officer, contrary to the fiftieth section of the act of 1799, c. 128 [1 Stat. 665, c. 22]. The second count alleged, that the same goods were found concealed in a certain store in Boston, the duties on the same goods not having been paid or secured to be paid, contrary to the form of the statute in such cases made and provided. This last count was in fact founded upon the sixty-eighth section of the act of 1799, c. 128 [1 Stat. 677, c. 22]. The jury found a verdict for the claimant upon the issue on this last count, which may therefore be laid out of the case. Upon the first count the claimant filed a plea alleging, that the goods were not unladen or delivered from any ship or vessel within the United States, without a permit or special license for such unlading and delivering, in manner and form, as in the first count, was alleged; and upon this plea issue was joined, and a verdict was found for the United States, as already stated. The fiftieth section of the revenue collection act of 1799, c. 128 [1 Stat. 665, c. 22]. in substance states, that no goods, wares or merchandise, brought in any ship or vessel, from any foreign port, or place, shall be unladen from such ship or vessel, within the United States, but in open day, &c. &c.; nor at any time, without a permit from the collector and naval officer, if any, for such unlading or delivering; and if any goods, wares or merchandise, shall be unladen or delivered from any such ship or vessel, contrary to the direction aforesaid, it is among other things declared, that they shall become forfeited. In point of fact, the goods in the present case were unladen and delivered at the port of New York, upon a permit, regular in form, granted by the deputy collector, to the claimant. But the United States contended, and offered proof, that the permit was obtained by the claimant by a fraudulent conspiracy with and bribery of the deputy collector of the port of New York, and by false and fraudulent invoices produced by the claimant; and the United States contended, that if this state of facts was established in evidence, then the permit was a mere nullity.

The bill of exceptions stated as follows: "Upon the trial, the attorney of the United States offered evidence for the avowed purpose of proving, in connexion with other evidence to be offered, that for a number of months previous to May, 1838, the date of the original seizure of the said goods, the claimant had, by fraudulent conspiracy with, and the bribery and corruption of, one James Campbell, a deputy collector of the port of New York, fraudulently and illegally obtained permits for the landing of large quantities of broadcloths, of a similar character and description to those described in said information, and without having paid the duties prescribed by law thereon, and of which, the said attorney proposed to offer evidence tending to show, that the goods described in said information were a part, and proposed to offer in evidence, twenty-three entries of cloths, made by the said claimant, before the said Campbell, between the fifth day of August, 1837, and the fifteenth day of March, 1838. in each of which entries the said Campbell had designated and selected the packages, set down as of the highest cost, to be sent to the appraiser's office for appraisement. And for the purpose of explaining and showing the said system of fraudulent collusion and bribery, the said attorney of the United States, also having made proof, that the original was lost or in the hands of the said claimant, and of notice to the claimant to produce the same, proposed to offer proof of the contents of a certain entry of broadcloths other than

those set forth in the information, imported in a ship called the Roscoe, by the claimant, and by said claimant entered before or with the said Campbell, on the ——— day of ———, 1838, in which said entry said Campbell had in like manner designated and selected the package, set down therein as of the highest cost, to be sent to the appraiser's office for appraisement, and did then and there propose to offer other documents, and the evidence of certain officers of the customs of New York, to show that said package, so designated, was passed and allowed as being correctly entered; and that afterwards, at New York, the whole of said packages contained in said entry, by the Roscoe, upon seizure, and examination and appraisement were, and the cost thereof, with the exception of said package so designated by said Campbell, found to be falsely and fraudulently set down in said entry. To the admission of each and all of which papers and documents and said testimony, the counsel for said claimant objected, as being irrelevant, and, as they contended, offered merely to prove the misconduct of the claimant in the importation of goods, other than those mentioned in the information, and in making fraudulent entries of the same,—whereby the jury might and would be prejudiced as to the goods set forth in the information. But the court overruled the objection, and the said entries, documents and testimony were admitted, and went in evidence to the jury.

"The counsel for the government proposed also to show, that said Campbell did not, in relation to entries made by other individuals, than said claimant, before him, as said deputy collector, usually indicate or select to be sent for appraisement, the package, set down therein, as of the highest cost, and for that purpose offered a certain entry made by a certain Thomas Hunt & Co., dated March 13th, 1838, of goods before and with said Campbell, imported by them in the ship Independence, in which said Campbell had not so indicated and selected the highest cost package, as set forth in said entry. To the admission of this evidence the counsel for the claimant objected, but the court overruled the objection, and said document was read and went in evidence to the jury. The counsel for the government further proposed to show, that certain broadcloths of the same character, cost, and value as those imported by claimant in the Roscoe, were shipped in England at or about the time when said claimant's goods by the Roscoe were shipped; that said goods were shipped by the same persons in Liverpool as had shipped the claimant's goods by the Roscoe, and all the other goods of claimant contained in said twenty-three entries before described; that the marks on the cases containing said goods were identical with the marks on the cases of claimant's goods by the Roscoe; that the numbering on said cases was an exact and progressive continuation of the numbering on the cases containing claimant's said goods by the Roscoe; that said goods arrived by four distinct importations at New York, soon after the seizure of the claimant's goods per Roscoe, and before notice of said seizure could possibly have reached England; that said goods, on their arrival were not entered, but sent to the custom house stores, where they lay several months; but they were eventually entered by one William Bottomley, as being the property of James Bottomley, senior; that the invoices had no exporter's oath at the time of shipment, as is usual, but the same was taken in England several months afterwards, and after a lapse of time fully sufficient for the transmission of intelligence to England, of said seizure of claimant's goods by the Roscoe; that the said invoices and oaths (when thus after the said lapse of time produced) set forth the cost of said goods at a greatly higher rate and sum than said goods so imported by claimant in the Roscoe, and proposed to submit this evidence to the jury as tending to show, that the said goods in fact belonged to the claimant, and that the cost of said goods, as set forth in the invoices and entries thereof, thus eventually made, show that the cost of the goods by the Roscoe, as entered by the claimant, was knowingly and fraudulently set forth in the entry thereof. To all and every part of this evidence the claimant's counsel objected; but the objection was overruled, and the evidence was submitted to the jury.

"The counsel for the claimant requested the court to instruct the jury, that if a permit was actually granted, although obtained by fraud, it would not be void, but good within the fiftieth section of the collection law of 1799. But the court did not so instruct the jury, but did instruct them, that if they should find from the evidence, that the permit given in the case was obtained by fraudulent collusion on the part of the claimant with the deputy collector, in such case the permit should be considered as void, and the information would be maintainable on the first count. The counsel for the claimant also requested the court to instruct the jury, that if a permit obtained by fraudulent collusion on the part of the claimant aforesaid, is by law void, and goods landed under the same, are forfeited within the said fiftieth section of said act; yet that the first count in said information is not sufficient, in point of law, to reach the case of goods thus landed. But the said judge did not so instruct the jury; but did instruct them, that said first count in said information, is, in point of law, sufficient to reach the case of goods purporting to be landed under such permit so obtained."

[For decision as to the fees of the marshal who had custody of the goods, see Bottomley v. U. S., Case No. 1,689.]

Mills, Dist. Atty., and Fletcher and Bartlett, for the United States.

Sprague and Gray (with whom was Miller, of New York), [for claimant].

STORY, Circuit Justice. Upon this bill of exceptions the questions, which have been argued at the bar, are: (1) Whether the evidence, as above stated, was properly admitted at the trial by the learned district judge. (2) Whether the points of law ruled by him, as to the effect of fraud and collusion in obtaining the permit, were correctly ruled.

In respect to the evidence admitted at the trial, assuming that the other points are in favor of the United States, I am clearly of opinion that the whole of it was admissible to substantiate the fraud. It divides itself into four heads: (1) The evidence tending to prove the conspiracy and fraud and collusion of the claimant and the deputy collector, in respect to the twenty-three packages of goods, of which the goods secured were a part. It is scarcely contested, that this was proper evidence. (2) The evidence tending to prove, that the goods, imported in the Roscoe by the claimant, were imported and landed by the perpetration of a similar fraud between the same parties. (3) The evidence tending to prove, that in other cases of the importation of similar goods by other importers, the deputy collector did not select the highest cost packages, as he did in the case of the claimant, and thereby to strengthen the inference of conspiracy and fraud and collusion. (4) The evidence of the importation of other goods of the same character, cost, and value, as those imported by the claimant in the Roscoe, shipped about the same time with those in the Roscoe, marked with the same marks, and numbered in an exact and progressive continuation of the cases of the goods of the claimant in the Roscoe; and, also, evidence, that the same goods arrived in four different shipments soon after the seizure of the claimant's goods in the Roscoe, and before the news of the seizure could have reached England; that the same goods were not then entered at the custom house, but were entered by one William Bottomley, as being the property of James Bottomley, senior, after full knowledge of the seizure must have been known in England; and that they were then entered at a greatly enhanced price and rate beyond those imported in the Roscoe. This last evidence was avowedly offered as tending to establish two important facts: (1) That the claimant was the real owner of these shipments; (2) that the cost of the goods by the Roscoe, as entered by the claimant, was knowingly and fraudulently set forth in the entry.

The objection taken to all these three last portions of the evidence excepted to, is, that it is res inter alios acta, and upon other occasions; and therefore, not properly admissible to establish a fraud in the case of the importation of the goods now before the court. But it appears to me clearly admissible upon the general doctrine of evidence in cases of conspiracy and fraud, where other acts in furtherance of the same general fraudulent design are admissible; first, to establish the fact, that there is such a conspiracy and fraud; and, secondly, to repel the suggestion, that the acts might be fairly attributed to accident, mistake, or innocent rashness, or negligence. In most cases of conspiracy and fraud, the question of intent, or purpose, or design in the act done, whether innocent or illegal, whether honest or fraudulent, rarely admits of direct and positive proof; but it is to be deduced from various circumstances of more or less stringency, and often occurring, not merely between the same parties, but between the party charged with conspiracy or fraud and third persons. And in all cases, where the guilt of the party depends upon the intent, purpose, or design, with which the act is done, or upon his guilty knowledge thereof, I understand it to be a general rule, that collateral facts may be examined into, in which he bore a part, for the purpose of establishing such guilty intent, design, purpose, or knowledge. Thus, in a prosecution for uttering a bank note, or bill of exchange, or promissory note, with knowledge of its being forged, proof, that the prisoner had uttered other forged notes or bills, whether of the same or of a different kind, or that he had other forged notes or bills in his possession, is clearly admissible as showing, that he knew the note or bill in question to be forged. So the law is laid down in Mr. Phillips and Mr. Amos's excellent treatise on Evidence, in the last edition.[3] The same doctrine is applied in the same work to a prosecution for uttering counterfeit money, where the fact of having in his possession other counterfeit money, or having uttered other counterfeit money, is proper proof against the prisoner to show his guilty knowledge.[4] I have looked into the authorities; and they fully support the statement of the learned writers. King v. Wylie, 1 Bos. & P. [N. R.] 92, is very strong to the purpose; as are also Rex v. Ball, 1 Russ. & R. 132, and Rex v. Balls, 1 Moody, Crown Cas. 470, and Rex v. Hough, 1 Russ. & R. 120. Many other cases may be easily put, involving the same considerations. Thus, upon an indictment for receiving stolen goods, evidence is admissible that the prisoner had received, at various other times, different parcels of goods, which had been stolen from the same persons, in proof of the guilty knowledge of the prisoner.[5] So, in an indictment for a conspiracy to create public discontent and disaffection, proof is admissible against the prisoner, that at another meet-

---

[3] Phil. & A. Ev. (8th London Ed.) 494.

[4] Phil. & A. Ev. (8th London Ed.) 495.

[5] Rex v. Dunn, 1 Moody, Cr. Cas. 146; Phil. & A. Ev. (8th London Ed.) 497.

ing held for an object professedly similar, and of which the prisoner was chairman, resolutions were passed of a character to create such discontent and disaffection.[6] In short, wherever the intent or guilty knowledge of a party is a material ingredient in the issue of a case, these collateral facts, tending to establish such intent or knowledge, are proper evidence. In many cases of fraud it would be otherwise impossible satisfactorily to establish the true nature and character of the act. Thus, for example, in cases of asserted fraudulent conveyances, procured by imposition and undue influence, or otherwise, it may often be necessary to give evidence of collateral transactions of a similar nature between the parties, or between the criminated party and third persons, to establish the point, although general imputations of an intended or attempted fraud upon third persons in other transactions of a totally different nature, might not be admissible.[7] If the question were, whether a particular voluntary conveyance was made in fraud of creditors, it might afford very strong evidence of the intent, if by like conveyances to other persons, who are mere volunteers, made about the same time, the grantor had parted with all his other property; yet the objection might be there stated, that they were res inter alios acta. The fourth portion of the evidence objected to, stands, as the learned counsel for the plaintiff in error, admits, upon stronger grounds in his favor, than any of the others; and yet, I think, that taking all the circumstances together, it is impossible not to feel, that the jury might well believe, that these last shipments were the property of the claimant, and were shipped for the like purposes of fraud; and that the subsequent entry of them in the name of the father, upon invoices of a much higher valuation of the cost of the goods, was a mere cover to escape seizure, and demonstrated, that the other goods, imported in the other vessels, had been grossly and fraudulently undervalued. I do not say, that the conclusion was inevitable. It is sufficient to establish the admissibility of the evidence, that it might legitimately lead the jury to such a conclusion.

There is a still stronger ground applicable to cases of this sort, which makes it incumbent upon the government to make out strong proof of conspiracy, collusion, and fraud. The charge is against a public officer of such conspiracy, collusion, and fraud, in the discharge of the duties of his office. Now, the ordinary presumption of law is in favor of the innocence of the officer, and, if I may so say, of his general character being elevated above the meanness of perpetrating an official fraud. This presumption will prevail even against circumstances of suspicion.[8] But it is completely overcome by

the fact, that you establish beyond controversy similar official delinquencies on his part in other transactions of a similar character, and especially in other transactions between himself and the same party. He, who has the baseness to accept a bribe, or knowingly to connive at a false entry of goods to defraud the public in one case, withdraws from himself all the sanctity of his official character in other cases of a similar nature. And, if the machinery to accomplish the fraud in one case, is exactly the same, to which he resorts in another, the presumption, that he intends the like fraud, becomes highly inflamed, if not positively irresistible. To exclude evidence of the use of such machinery in other cases, shown to be fraudulent, would be to shake all just confidence in the rules of evidence in the administration of public and civil justice.

The other questions, which arise upon the instructions asked and refused, as well as upon those given by the learned judge of the district court, resolve themselves into these two: (1.) Whether, if the permit was obtained by a fraudulent collusion between the claimant and the deputy collector, it was utterly void. (2.) And if so void, whether the goods landed under such a permit so obtained, can be declared forfeited upon the first count, as actually framed; or whether there should have been a special count framed, stating the actual facts of the fraud, and then concluding, that so the permit was void. I say, that these are the only questions; for, upon the actual posture of the case before the court, no other questions properly arose in judgment. And if the instructions, asked by the claimant, and refused by the court, went beyond these, they were properly refused, as being abstract and irrelevant to the actual merits of the controversy, or were too vague and general to entitle the claimant to have them answered. The supreme court of the United States have often held, that it is no error to refuse instructions, asked by a party, which are open to either objection; because they may have a tendency to mislead the jury.

In the first place, then, was the permit in the present case, if obtained by fraud and collusion between the claimant and the deputy collector utterly void, so that it may be treated as a mere nullity, exactly as if there had been no permit at all for the landing of the goods? The point is, as far as I know, new with reference to the 50th section of the act of 1799, c. 128 [1 Stat. 665, c. 22]; and, therefore, it must be disposed of upon general principles and the analogies of the law. Now, the general rule certainly is, that whenever fraud intervenes in any act, contract, deed, conveyance, or other instrument, however solemn it is, it is, as to the party, upon whom the fraud is perpetrated, or whom it is designed to injure, utterly void. If the fraud is concocted for the purpose of cheating third persons, it may bind the immedi-

---

[6] King v. Hunt. 3 Barn. & Ald. 566, 573.

[7] See Somes v. Skinner, 16 Mass. 348, 360.

[8] See U. S. v. Hayward [Case No. 15,336].

ate parties to it, so as to estop them from setting up the original invalidity of the transaction. But, as to such third persons, the transaction, however solemn it may be, is utterly void; and it may be treated as a nullity, whenever it is asserted in opposition to their rights. But when the fraud is perpetrated by one of the parties to the transaction upon the other, there the transaction, be it what it may, an act in pais, a deed, an authority, a conveyance, or any other instrument, is utterly void. In contemplation of law it never had any existence whatsoever. This is the general rule. It operates universally as between the parties themselves; although there may be exceptions to it in particular cases in favor of third persons, as for example, in cases of negotiable instruments, bank notes, and other currency, where reasons of public policy and the interests of bona fide holders may require exceptions. Such, however, is not the present case; for here the claimant, the concoctor of the very fraud, (if proved,) sets it up to protect himself against the rights of the very party, whom he had defrauded. He says, in effect, I have bribed and corrupted your agent, and have corruptly and illegally obtained from him a permit to land these goods in violation of your rights; and, now I insist, that I have a right by law to shield myself and my property from forfeiture, under the protection of that very permit, as if it were a legal and honest instrument. Now, I know of no case, and of no doctrine, which thus enables a man to set up his own turpitude, dishonesty, and illegal acts, as a defence against the rights of the innocent and injured party.

In the common case of a conveyance to defraud creditors, we all know, that it is valid and obligatory between the parties; because the law will not tolerate the grantor in setting up his own turpitude, to avoid his own solemn act. It leaves him to bear the burden of his own iniquity, and to submit to the loss of the property, of which he intended to cheat others, upon the known maxim, "In pari delicto melior est conditio possidentis." As the party has made his own bed, so he must lie on it, however uneasy may be his posture. But in relation to the creditors, we all know, the same conveyance is treated as an utter nullity, and is not for a moment allowed to intercept their rights. But, take the case, where one party obtains a license, contract, obligation, conveyance, or other instrument, from another by fraud, imposition, or undue influence upon the latter, the transaction is constantly treated as a mere nullity between them. It has, in contemplation of law, no existence whatsoever. Take the case of a deed obtained from a lunatic or a drunkard, while in a state of lunacy or gross intoxication; we all know, that the deed is treated as a nullity, and non est factum is a good plea to it. Yates v. Boen, 2 Strange, 1104; Cole v. Rob-

erts, Bull. N. P. 172;[9] and Somes v. Skinner, 16 Mass. 348, are directly in point, as to a conveyance obtained by fraud, imposition, and undue influence; and Anthony v. Wilson, 14 Pick. 303, as to a license obtained by fraud, to enter a house. This latter case was an action of trespass quare clausum fregit, and the license was set up as a defence by a special plea, and the replication denied the license. At the trial, it was proved, that the license was obtained by fraud; and it was held by the court, that a license obtained by fraud was a mere nullity. Mr. Justice Putnam, in his able opinion delivered for the court on that occasion, took the true distinction, that where the license is merely voidable, the fact, which avoids it, must be specially replied; but where it is void ab initio, there the party may legally deny, that he ever gave any license at all; for it may be considered, as if it never had any existence.

Now, if this doctrine be true between the direct parties, acting in their own right, must it not apply with superior force to the acts of mere agents, and especially to public agents, who are acting under a limited authority prescribed by law? Suppose a private agent should, by fraud and collusion with a purchaser, sell the goods of his principal, in known violation of his orders or duty, might not the principal treat the sale as a nullity, and maintain trover for the conversion? I apprehend, that there is no doubt of that. Suppose, which is closer to the present case, the clerk of a commission merchant, having a lien upon goods for his advances and commissions, should fraudulently deliver up those goods, in connivance with the owner of them; could not the commission merchant treat the transaction as a nullity, and recover back the goods from the owner? Suppose the cashier of a bank should fraudulently and collusively deliver up to the parties any notes or securities discounted for them at the bank, or any property, lodged as a pledge or collateral security, in known violation of his duty; would not the whole proceeding be a mere nullity, and treated as such in law, to all intents and purposes? It seems to me, that no doubt could possibly exist in either of these cases.

At the argument, I put a case to the learned counsel for the claimant, to this effect. The 49th section of the collection act of 1799, c. 128 [1 Stat. 664, c. 22], requires an entry of the goods, and an estimate of the duties due thereon, to be made by the collector; and upon the estimated duties being paid, or secured to be paid, it then, and not before, authorizes the collector to grant a permit to land them. These, therefore, are preliminaries to the grant of the permit. Suppose, there should be no entry, no esti-

---

[9] See, also, 1 Story, Eq. Jur. § 230, and note; and note to Lambert v. Atkins, 2 Camp. 272, 273.

mate of the duties, and no payment made or security given for the duties; but the collector should, notwithstanding, knowingly and fraudulently, in collusion with the consignee or importer, give a permit to land the goods, and they were accordingly landed; would such a permit, under such circumstances, be a lawful permit, and protect the goods from forfeiture? No answer was given to this case; and, in my judgment, no other satisfactory answer can be given, but that in such a case the permit would be a mere nullity, and not a legal instrument. Now, in no substantial respect whatsoever does that case differ from the present. Here, no true entry, or honest estimate of duties, has ever been made; the duties justly due have never been paid, or secured to be paid. In each case, the transaction is equally a gross and palpable fraud; and the more or less of aggravation in the circumstances cannot change the legal result. It makes no difference in the concoction of the fraud, in legal intendment, whether it defrauds the government of the whole, or of the half, or of the quarter of the legitimate duties. It is still tainted and putrescent throughout. It is in known violation of law; and no act done in known violation of law, can be admitted to have any legal validity. It would be a contradiction in terms. Upon the whole, I am entirely satisfied, upon full deliberation, that the permit in the present case, if obtained by fraud and collusion between the claimant and the deputy collector, (as the jury have found it was,) was utterly void, and a mere nullity, and never had any legal existence as a permit. The cases of Cutts v. U. S. [Case No. 3,522]; U. S. v. Lyman [Id. 15,647]; and Johnson v. U. S. [Id. 7,419], involved many considerations directly applicable to the present point; and I see no reason to be dissatisfied with those judgments.

In respect to the other point, whether the first count, alleging, that the goods were landed without a permit, can be supported by the proof of a permit granted by fraud and collusion between the claimant and the deputy collector, it does not appear to me to involve any serious difficulty. The argument is, that the special circumstances of fraud ought to have been set forth in the count, and then the conclusion of law stated, that thereby the permit became void. But it does not appear to me, that this argument is well founded. It is a general rule in pleading, that the party may declare upon the case according to its legal effect, and that he need not set forth the particular circumstances, which bring the case within the reach of the general allegations. An action for money had and received is maintainable for money had and received or retained by fraud; and no special count is necessary. So, in the case of Anthony v. Wilson, 14 Pick. 303, already cited, it was held, and in my judgment with entire accuracy, that the party may support an issue of no license, by proof that the license set up in the case was founded in fraud. That is a case directly in point to the present objection. Whelpdale's Case, 5 Coke, 119, has been cited to the contrary; but it does not appear to me to support it, when examined in its just bearing. The true distinction is between deeds, which are void ab initio, and deeds, which are voidable only. In the former case, the plea of non est factum is entirely proper; in the latter, a special non est factum is required. Lord Ellenborough stated the true distinction in Lambert v. Atkins, 2 Camp. 272, 273; and it was affirmed and illustrated by Mr. Justice Putnam, in Anthony v. Wilson.[10] The moment, that it is ascertained, that any act, deed, or instrument is founded in fraud, that act, deed, or instrument must be treated as a nullity, and as if it had no legal existence in relation to the injured party. It seems to me, therefore, that upon the strictest rules of pleading, the present objection is not maintainable, even if, in cases of revenue seizures, one were disposed to import into informations and libels all the niceties of the common law in other cases. In new cases, not governed by antecedent authorities, I should not incline to support mere technical niceties, or to give them a wider range. The days for such subtleties are, as I trust, in a great measure passed away.

It has been suggested, that parol evidence is not, and ought not to be admitted to prove fraud in making entries, or invoices of goods, or in obtaining permits, after the goods have passed from the custom house, and have undergone the regular inspection of the public officers. This is pressed upon the ground of the supposed danger and public inconvenience of such evidence, after the goods can no longer be inspected and examined, so as to justify or to repel the presumption of fraud; and the dangers to subsequent bona fide purchasers of the goods. I cannot admit the argument to be well founded in point of law. I know of no case, where parol evidence is not admissible to establish fraud, even in the most solemn transactions and conveyances. What would become of prosecutions for perjury in swearing to false invoices, if we were to exclude parol evidence to show the true cost, or the actual sworn value of the goods? What should we do in cases of fraudulent conveyances to cheat creditors, or of fraudulent deeds, procured by undue influence, or gross violence, or meditated imposition? What should we do in cases of forgery by alteration of written instruments, or of the utterance of false bank bills? The present bill of exceptions does not, indeed, raise any question of this sort; and, therefore, it is unnecessary to dwell on it. But I desire not to be understood for a single moment to doubt the entire propriety, and even necessity of allowing parol

[10] See, also, Com. Dig. "Pleader," W. 2, 18; 1 Chit. Pl. (3d. Ed.) 479.

3 Fed. Cas. page 975]

evidence in all cases of fraud. Upon the whole, my opinion is, that the judgment of the court below ought to be affirmed with costs.